[No. C072981. Third Dist. Jan. 27, 2015.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN ANDREW ZINDA, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication in the official reports with the exception of parts II and III of the Discussion.

## Counsel

Charles M. Bonneau, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Michael P. Farrell, Assistant Attorneys General, Catherine Chatman and Larenda R. Delaini, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

HOCH, J.—Defendant Steven Andrew Zinda chased David Valdez into a field and murdered him with an axe. Tragically, a poor decision placed Valdez in the wrong place at the wrong time. After drinking with some friends at a house in Rio Linda, Valdez decided to leave around 2:00 a.m. He was intoxicated and did not make it very far before driving his Honda Passport into a ditch near defendant's house. Valdez stayed with his vehicle while two friends left in a truck to get some tow chains. Meanwhile, defendant's house was being burglarized. Defendant stayed the night at a friend's house, but had reason to believe certain neighborhood gang members wanted to steal from him, so he set his alarm for 3:00 a.m. and stopped by his house to check on it before his early morning work shift. He arrived to find the burglary in progress. One burglar fled to a waiting car and drove away. Defendant went into his house, grabbed an axe from inside, and came back out. He then saw Valdez waiting for his friends on the side of the road. Assuming Valdez was one of the burglars, defendant walked out to him with the axe and yelled: "Did your buddies leave you, man?" Valdez ran. Defendant took this to be an admission of guilt and gave chase with the axe. When he caught up to Valdez in a field about a quarter mile away, defendant swung the axe and either "missed him the first time" or "got him like in the shoulder or maybe his upper body." He then grappled with Valdez on the ground, "givin['] him elbows," and swung the axe a second time, which "gashed him up on his face." Defendant then hit Valdez with the axe "one or two more times . . . to finish it off."

Defendant was convicted by jury of second degree murder and found to have personally used a deadly weapon during the commission of the crime. He was sentenced to serve an indeterminate prison term of 15 years to life plus a consecutive determinate term of one year.

On appeal, defendant contends the trial court (1) erred by not instructing the jury, sua sponte, on (a) justifiable homicide in making an arrest, and (b) mistake of fact; (2) erroneously instructed the jury on heat of passion

voluntary manslaughter; and (3) erroneously excluded "evidence that [Valdez] claimed a gang affiliation, and photographs which either suggested a gang affiliation or gave a more accurate and neutral portrait of the victim near the time of his death."

We affirm the judgment. As we explain, defendant was not entitled to a sua sponte instruction on justifiable homicide in making an arrest or on mistake of fact. The justifiable homicide instruction was not supported by substantial evidence because there was no evidence defendant was attempting to arrest Valdez for burglary. Such a theory was also inconsistent with defendant's theory of the case, i.e., while defendant killed Valdez unlawfully, the crime was not murder but voluntary manslaughter. The mistake of fact instruction also lacks evidentiary support because defendant's erroneous belief Valdez was involved in the burglary does not make killing him with multiple axe blows an innocent act. Nor is mistake of fact a true affirmative defense implicating the trial court's sua sponte instructional duties. We need not determine whether the trial court erroneously instructed the jury on heat of passion voluntary manslaughter because defendant was not entitled to voluntary manslaughter instructions. Nor did the trial court abuse its discretion by excluding the proffered photographic evidence and other evidence Valdez claimed a gang affiliation.

## FACTS

On the night of March 19, 2011, Valdez and a close friend, Justin Trammell, went to a house in Rio Linda where they drank alcohol and played cards with friends. Valdez and Trammell rode to the house together in Valdez's Honda Passport, a midsize SUV. Valdez drove and brought over a large bottle of rum. Renee Ross was in charge of the house for the night; she was watching her three half sisters while her father and stepmother were out of town. Ross's boyfriend, Craig Seagrove, was also at the house, as were several other people. Ross apparently collected car keys since they would be drinking.

Around 2:00 a.m., Valdez and Trammell decided to leave. They were intoxicated. Ross tried to keep them from leaving, but Valdez "got the keys back" and walked out of the house carrying the bottle of rum. Trammell followed. So did Seagrove. Valdez and Trammell left in the Passport, which did not make it very far before sliding off the road and into a ditch. Seagrove witnessed the crash from the driveway and walked over to the Passport as Valdez spun the tires in the mud. At 2:51 a.m., after various unsuccessful attempts to extricate the vehicle from the ditch, Valdez called another friend, Cory Rossbo, and asked him to bring his four-wheel-drive Chevrolet truck to pull the Passport out of the ditch. Rossbo agreed. Seagrove went back to the

house. When Rossbo arrived about 10 minutes later, he realized he did not have the proper equipment, so Trammell got into the Chevrolet and the two drove to Trammell's house to pick up tow chains. Valdez stayed with his vehicle.

On the way to Trammell's house, Rossbo noticed a nearby house's garage door was open and two men were walking around in the garage. The house belonged to defendant, who had stayed the night at a friend's house after watching a pay-per-view UFC (Ultimate Fighting Championship) fight. The people in the garage were burglars. Defendant, who believed his house was in danger of being burglarized by neighborhood gang members, had set his alarm for 3:00 a.m. so he could check on his house before his early morning work shift. He arrived around 3:15 a.m. to find a small white car parked in front of his house and the garage door wide open. Defendant pulled into his driveway and ran into the house through the garage. Hearing the front door shut as he entered the house, defendant grabbed a golf club and ran out the front door. One of the burglars was getting into the white car. Defendant gave chase and hit the car with the golf club as it drove away. He then returned to the house, shut the garage door, and assessed what had been taken in the burglary. A short time later, defendant went back outside, this time with an axe, and noticed Valdez on the side of the road a short distance from the house.

Defendant assumed Valdez was involved in the burglary, walked over to him carrying the axe, and yelled: "Hey what happened to you? Did your buddies leave you, man?" Valdez ran. Defendant took this to be an acknowledgment of guilt and gave chase with the axe. He described the pursuit: "I'm runnin['] with my axe, dude, . . . right behind him and shit, dude, and he's getting all tired, dude. He's goin['] on both sides of the road and shit, like not knowin['] where to . . . go, dude." Defendant caught up to Valdez about a quarter mile away. Valdez climbed a fence in an attempt to escape through a field, but fell over the top of the fence and landed on the ground. Defendant reached the fence about the same time, entered the field through a gate, and confronted Valdez: "You tryin['] to rob my house, man?" He then "took a swing at him." Defendant elaborated: "I hit him with the axe the first time or I think I mighta missed him a little bit, but maybe got him in the upper body and then . . . I'm scufflin['] around with him, dude I'm givin['] him elbows, dude, that's close combat, dude." Defendant then swung the axe a second time, which "gashed him up on his face," followed by "one or two more" swings of the axe "to finish it off." Defendant kicked Valdez in the back before returning to his house.

Meanwhile, when Trammell and Rossbo got to Trammell's house to pick up the tow chains, they discovered Trammell's horses had escaped from their

enclosure. Collecting the horses took at least an hour. At 3:41 a.m., Rossbo called Valdez to let him know they would be late with the tow chains, but Valdez did not answer his cell phone. Around 4:00 a.m., after the horses were put away, Trammell called Valdez several times. Again, no one answered. Trammell and Rossbo then returned to the Passport with the tow chains. There was no sign of Valdez. Assuming he had gone to a girlfriend's house, which was nearby, Trammell and Rossbo abandoned the mission and returned to their respective homes.

Around the same time, defendant called his sister and told her what had happened. He called 911 about 30 minutes later. When sheriff's deputies arrived, defendant directed them to Valdez's body, indicating he believed Valdez to be a member of a local street gang called the Boss Hoggs. Valdez was pronounced dead at the scene. Later in the morning, defendant gave a full statement to Detective Stanley Swisher. His account of events was that described above. During the interview, defendant also stated he "always kinda had problems" with neighborhood "gang bangers" who claimed to be affiliated with a Southern California street gang called the Pirus. When Detective Swisher posited the scenario that Valdez was simply waiting for his friends to arrive to pull his car out of the ditch when defendant came home to find his house being burglarized by other people, and ran not because he was involved in the burglary, but rather because defendant was "pissed off" and coming at him with a "big axe," defendant said he would be "devastated" if he killed Valdez for the wrong reasons.

## DISCUSSION

### I

### *Failure to Instruct on Defenses*

Defendant contends the trial court erred by not instructing the jury, sua sponte, on two defenses: justifiable homicide in making an arrest, and mistake of fact. He is mistaken.

■ "A trial court has a duty to instruct the jury 'sua sponte on general principles which are closely and openly connected with the facts before the court.' [Citation.] . . . [A] trial court has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case.' " ' [Citation.]" (*People v. Abilez* (2007) 41 Cal.4th 472, 517 [61 Cal.Rptr.3d 526, 161 P.3d 58].)

## A.

### *Justifiable Homicide in Making an Arrest*

Penal Code section 197 provides in relevant part that homicide is justifiable "[w]hen necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed . . . ."[1] (§ 197, subd. 4.)

There appears to be disagreement in the appellate decisions interpreting this provision as to the meaning of "any felony." In *People v. Piorkowski* (1974) 41 Cal.App.3d 324 [115 Cal.Rptr. 830] (*Piorkowski*), the Second District Court of Appeal explained: "At common law, one could use deadly force to prevent the commission of a felony. [Citation.] Statutory expansion of the class of crimes punishable as felonies has made the common law rule manifestly too broad. [Citation.] It appears that the principle that deadly force may be directed toward the arrest of a felon is a correct statement of the law *only where the felony committed is one which threatens death or great bodily harm*. [Citation.]" (*Id.* at pp. 328–329, italics added.) There, the victim and two accomplices entered a dry cleaning establishment during business hours and stole a dollar bill from the counter and a wallet from a purse that was behind the counter. (*Id.* at p. 328.) The court held, "the character of the crime and the manner of its perpetration did not warrant the use of deadly force to effect the [victim's] arrest, i.e., [the homicide] was not 'necessarily committed,'" and explained: "While this factual pattern may constitute 'statutory burglary,' which is a felony [citation] clearly there is not the attendant risk to human life which accompanies common law burglary." (*Id.* at p. 330.)

In *People v. Quesada* (1980) 113 Cal.App.3d 533 [169 Cal.Rptr. 881] (*Quesada*), the First District Court of Appeal applied the reasoning of *Piorkowski, supra*, 41 Cal.App.3d 324 to a homicide committed while the defendant attempted to apprehend a person suspected of burglarizing his unoccupied home *two days earlier*. The defendant engaged others to buy a stereo from the suspect, confirmed the stereo had been stolen from his apartment, and tried to make an arrest. When the suspect drove away, the defendant shot and killed him. (*Quesada, supra*, at pp. 536–537.) The court held the trial court did not err in refusing to instruct the jury that "homicide is justifiable 'when necessarily committed in attempting, by lawful ways and means, to apprehend any person who has committed burglary of the first degree.'" (*Id.* at p. 537.) The court explained that "since a burglary committed when no one is on the premises is not a crime which threatens death or serious bodily harm so as to justify the use of deadly force in preventing its

---

[1] Undesignated statutory references are to the Penal Code.

occurrence," for example, one may not justifiably use a trap gun to prevent a burglary (*People v. Ceballos* (1974) 12 Cal.3d 470 [116 Cal.Rptr. 233, 526 P.2d 241]), "it would seem to follow that it is not, or *at least not per se*, the sort of crime which justifies the use of deadly force by a citizen in apprehending the criminal. [¶] In the latter case, as well as the former, the modern common law rule limits the use of deadly force to 'dangerous' felonies: 'The law does not permit the use of deadly force for the mere purpose of *preventing* a nondangerous felony, and a private person cannot defeat this restriction merely by saying his [or her] purpose is arrest rather than prevention.' [Citations.]" (*Quesada, supra*, 113 Cal.App.3d at p. 539, first italics added, fn. omitted.)

However, in *People v. Martin* (1985) 168 Cal.App.3d 1111 [214 Cal.Rptr. 873] (*Martin*), the Fifth District Court of Appeal affirmed the dismissal of an information under section 995 where the defendant, an off-duty deputy sheriff who lived next door to his son, interrupted a common law burglary of the son's house and, knowing no one was home at his son's house, shot and killed one of the fleeing burglars. (*Id.* at p. 1114.) The court explained the conclusion in *Piorkowski, supra*, 41 Cal.App.3d 324 that the felony committed must threaten death or great bodily harm was based on *People v. Jones* (1961) 191 Cal.App.2d 478 [12 Cal.Rptr. 777], a case interpreting section 197, subdivision 1, which provides that homicide is justified "[w]hen resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person." Pointing out *Jones* "dealt with a felony (wife-beating) not recognized at the time section 197 was enacted," the court went on to explain: "There are important differences between subdivisions 1 and 4 of section 197. Under subdivision 1, homicide is justifiable in resisting an attempt to murder, or to commit a felony, or to do some great bodily injury. The language before and after 'to commit a felony' implies that the felony contemplated by that statute is one more dangerous than a personal assault. Additionally, at common law there was a broader privilege to use deadly force in arresting a felon than in preventing his [or her] criminal act. [Citation.]" (*Martin, supra*, 168 Cal.App.3d at p. 1118.)

Distinguishing *Quesada, supra*, 113 Cal.App.3d 533, the *Martin* court explained the instruction requested in that case "made no distinction between apprehension of the person who had committed the burglary while fleeing from the scene and apprehension after the felon had completed his [or her] escape. The social need for justification of a homicide committed in the latter circumstance, as in *Quesada*, is virtually nonexistent. In sharp contrast, failure to apprehend when the felon is fleeing the scene of the crime frequently means that the felon remains at large. Later investigation cannot represent a substitute for immediate apprehension. [Citation.] Accordingly, a person may reasonably expect that he [or she] is justified in using deadly force to apprehend a felon fleeing the scene of the crime. No such reasonable expectation could exist in attempting apprehension after escape. Other safer

and less drastic procedures for apprehension after escape are well known." (*Martin, supra,* 168 Cal.App.3d at pp. 1122–1123.) The court then found the "any felony" language of section 197, subdivision 4, to be ambiguous, construed the provision " 'as favorably to the defendant as its language and the circumstances of its application may reasonably permit,' " and concluded the Legislature intended "to include in the definition of 'any felony' those crimes which were felonies at common law" when section 197 was enacted, "including nighttime burglary of a dwelling house." (*Martin,* at p. 1123.)

We agree with *Martin* on the meaning of "any felony" in the statute. However, *Piorkowski* turned not on this language, but on the meaning of "necessarily committed," holding a homicide is " 'necessarily committed' " in attempting to apprehend a felon within the meaning of section 197, subdivision 4, "only where the felony committed is one which threatens death or great bodily harm." (*Piorkowski, supra,* 41 Cal.App.3d at pp. 330, 329.) In other words, as a matter of law, unless the felony threatens death or great bodily harm, the use of deadly force in apprehending the perpetrator is an unnecessary and unjustified use of force. Ordinarily, common law burglary would qualify. " 'Burglary laws are based primarily upon a recognition of the dangers to personal safety created by the usual burglary situation—the danger that the intruder will harm the occupants in attempting to perpetrate the intended crime or to escape and the danger that the occupants will in anger or panic react violently to the invasion, thereby inviting more violence. The laws are primarily designed, then, not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety.' " (*People v. Gauze* (1975) 15 Cal.3d 709, 715 [125 Cal.Rptr. 773, 542 P.2d 1365], quoting *People v. Lewis* (1969) 274 Cal.App.2d 912, 920 [79 Cal.Rptr. 650].) However, as *Quesada* explains, the fact there was a common law burglary does not, in and of itself, justify the use of deadly force in apprehending the perpetrator. (*Quesada, supra,* 113 Cal.App.3d at p. 539 [common law burglary does not "per se" justify the use of deadly force by a citizen in apprehending the criminal].) There, it was not necessary for the defendant to attempt to apprehend the burglar at all. Where the burglary was committed two days before the attempted apprehension, there was plenty of time to enlist the professional assistance of law enforcement. *Martin* presents the more typical case of a common law burglary that is interrupted in progress. While the occupants of the home were elsewhere, the crime still threatened death or great bodily harm since they could return at any time, or, as happened, a neighbor could decide to investigate the situation and confront the burglars. And, unlike *Quesada,* there was no intervening period of two days rendering a citizen's arrest unnecessary.

Here, as in *Martin, supra,* 168 Cal.App.3d 1111, defendant interrupted a common law burglary in progress. However, unlike *Martin,* there is no evidence defendant attempted to arrest Valdez. By his own account of

events, defendant chased Valdez about a quarter mile with the axe and killed him, not in an attempt to arrest him for the burglary, but because, as he put it, "just the way he looked to me, dude, he . . . wasn't a good person," and "these people are the type of people that are gonna threaten my life, dude." There was no attempted arrest, only a completed murder. Nor did defendant possess probable cause to arrest Valdez for burglary. After the only person defendant knew was involved in the burglary escaped by driving away, defendant went into the house and came back outside with an axe, saw Valdez on the side of the road, and simply assumed he was involved in the burglary. Neither defendant's assumption about Valdez's involvement nor the fact Valdez ran provided probable cause for arrest. Indeed, it is hard to imagine anyone who would have stayed put at the sight of an angry defendant approaching with an axe in the middle of the night. Without probable cause to arrest Valdez for burglary, the use of deadly force in making such an arrest was ipso facto unjustified. (See *Piorkowski, supra*, 41 Cal.App.3d at p. 328.)

Defendant's claim of instructional error fails for a separate reason. As stated previously, "a trial court has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on . . . , or if there is substantial evidence supportive of such a defense *and the defense is not inconsistent with the defendant's theory of the case.*' " ' [Citation.]" (*People v. Abilez, supra*, 41 Cal.4th at p. 517, some italics added.) At trial, the defense conceded the killing was unlawful, but argued the crime was not murder, but voluntary manslaughter because defendant acted "rashly" and "impulsively" under intense provocation. The theory now advanced on appeal, that the killing was a justifiable homicide necessarily committed in attempting to apprehend Valdez for burglary, is inconsistent with defendant's theory of the case.

We conclude the trial court had no sua sponte duty to instruct the jury on justifiable homicide.

## B.

### *Mistake of Fact*

■ We also conclude the trial court had no sua sponte duty to instruct on mistake of fact. The " 'defense' of mistake of fact requires, at a minimum, an actual belief 'in the existence of circumstances, which, if true, would make the act with which the person is charged an innocent act . . . .' [Citations.]" (*People v. Lawson* (2013) 215 Cal.App.4th 108, 115 [155 Cal.Rptr.3d 236].) The circumstance about which defendant claims to have been mistaken is Valdez's status as a perpetrator or accomplice in the burglary of his house.

Defendant does not assert this circumstance *alone* would make killing Valdez with multiple axe blows an innocent act. Instead, he argues: "In conjunction with [the justifiable homicide instruction,] the mistake-of-fact instruction would have made 'the act charged an innocent act.'" We have already explained the justifiable homicide instruction was not supported by substantial evidence because there was no evidence defendant was attempting to arrest Valdez for burglary. Thus, all that remains is defendant's mistaken belief Valdez was a burglar. Even if true, this circumstance does not insulate defendant from criminal liability. Accordingly, the mistake of fact instruction was not supported by substantial evidence. Moreover, mistake of fact is "not a true affirmative defense," but instead "serve[s] only to negate the mental state element of the crime . . . . Thus, even if substantial evidence supported an instruction on mistake of fact, the trial court had no duty to instruct on the defense sua sponte." (*People v. Lawson, supra,* 215 Cal.App.4th at p. 118.)

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Robie, Acting P. J., and Butz, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 29, 2015, S224871.

---

*See footnote, *ante,* page 871.